282 F.2d 919
 60-2 USTC P 9723
 UNITED FINANCE AND THRIFT CORPORATION OF TULSA, Formerly the
State Loan Company of Tulsa, and United Finance and Thrift
Corporation of Tulsa County,Formerly The State Loan Company,
(Oklahoma), Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
 No. 8093.
 United States Court of Appeals Fourth Circuit.
 Argued June 7, 1960.
Decided Sept. 29, 1960.
 
 Robert Ash, Washington, D.C., (Ash, Bauersfeld & Burton, Washington, D.C., on brief), foe petitioner.
 John J. Pajak, Attorney, Department of Justice, Washington, D.C., (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson and Harry Baum, Attorneys, Department of Justice, Washington, D.C., on brief), for respondent.
 
 
 1
 Before SOPER and HAYNSWORTH, Circuit Judges, and CHARLES F. PAUL, District Judge.
 
 
 2
 CHARLES F. PAUL, District Judge.
 
 
 3
 These are consolidated petitions for review of decisions of the Tax Court[1] disallowing, in part, deductions claimed by the taxpayers on account of depreciation. The taxpayers claimed in the Tax Court, and here insist, that they are entitled to deductions as 'new business development expense' of the full amounts of sums which they say were paid solely as consideration for 'covenants not to compete' obtained from the sellers, in connection with the purchase of certain business assets, by amortizing those sums over the duration of the covenants. The taxpayers claimed these deductions under applicable portions of Sec. 23 Internal Revenue Code of 1939,[2] and Sec. 39.23(1)-3 of the Treasury Regulations 118.[3] The Commissioner took the position before the Tax Court that the payments were, in substantial part at least, payment for intangible values, in the nature of good-will, which are not depreciable; that, insofar as the sums included any payment for a covenant not to compete, there was no basis for severability of that part and that the deductions should be denied in toto. The Tax Court decided that the sums paid were partly in consideration of the covenants not to compete and partly in consideration of assets in the nature of good-will. The Tax Court did, however, find some basis for severability and allowed the taxpayers substantial parts of their claimed deductions and denied the rest. The action of the Tax Court resulted in judgments determining deficiencies in the amount of $1,477.47, for the fiscal year ended September 30, 1953, against the petitioner, United Finance & Thrift Corporation of Tulsa, and of $2,624.32 for the calendar year 1952 against the petitioner, United Finance & Thrift Coporation of Tulsa County.
 
 
 4
 To trace the corporate genealogy of the petitioners, the various name changes through which they have gone, and the intercorporate assignments, can only serve to confuse. It is sufficient to state that both the petitioners are whollyowned subsidiaries of State Loan & Finance Company, a Delaware corporation, with its principal offices in Washington, D.C. The parent corporation operates, through various subsidiaries, about one hundred eighty-five 'small loan' offices in about nineteen to twenty States. The petitioners are both Oklahoma corporations which did business under the Oklahoma Small Loans Statutes, 150, S.1951 280.1 et seq., in the City of Tulsa. We will distinguish between them by calling the one simply 'Tulsa' and the other 'Tulsa County'.
 
 
 5
 On November 1, 1950, Tulsa County purchased all of the subsisting loan accounts of the Tulsa office of Royal Loan Company, which company was unrelated to Tulsa County, and secured from Royal a covenant not to compete with Tulsa County by engaging in the business of making loans in the amount of $300.00 or less in Tulsa for three years. The pertinent provisions of the contract are set forth in footnote.[4] Under the contract, the sum of $181,803.00, the full unpaid balance of the purchased notes, was paid for the notes and the additional sum of $23,397.00 was paid for the expressed consideration of the covenant not to compete. In its subsequent dealings with the former customers of Royal, Tulsa County made no use of Royal's name. It occupied the office formerly used by Royal for a period of about three months, until the office could be transferred elsewhere. For tax purposes, Tulsa County immediately began amortizing the sum of $23,397.00 on its books as a deductible item accruing from a depreciable covernant not to compete.
 
 
 6
 On October 7, 1952, Tulsa County entered into a similar agreement under which it purchased all of the loan accounts of another small loan company, Bankers Investment Company, with reference to its Tulsa office, and secured its covenant not to compete for a period of two years. In this agreement it was stipulated that $26,125.54 was being paid for the loan accounts, and $4,750.00 on account of the covenant not to compete. Tulsa County immediately began to depreciate this latter sum.
 
 
 7
 On October 10, 1952, Tulsa County assigned to 'Tulsa' all the remaining balances of the loan accounts it had purchased from Royal, including the unamortized cost attributed to the covenant not to compete by Royal, which was stated to be $8,448.59. 'Tulsa' undertook to amortize and deduct this latter amount in determining its taxable income.
 
 
 8
 In the Tax Court, the taxpayers admitted that it was their experience in the small loan business that borrowers do not meet their obligations on time; that this results in the necessity for 'refinancing' by extending another loan over a longer period of time, and that, on the average, a borrower remains on their books with respect to the original amount borrowed for a period of two and one-half years. Taxpayers further admitted that this 'refinancing' if profitable, and that its prospect was one of the main reasons why they were willing to pay more than the face amount of the book obligations in order to acquire another loan company's current accounts. The taxpayers insisted that their requirement of a covenant not to compete was, in the main, for the purpose of protecting this 'refinancing' value from the possibility of pirating by the selling loan company. Officials of both Royal and Bankers testified that they had also experienced repeat or new business from former borrowers and also new business from customers referred to them by former borrowers.
 
 
 9
 In this state of the record, we cannot say that the findings of the Tax Court that the extra payment included values in the nature of good-will or 'going concern' values are not supported by substantial evidence or that they are clearly erroneous.
 
 
 10
 The taxpayers rely heavily upon Commissioner of Internal Revenue v. Gazette Tel. Co., 10 Cir., 1954, 209 F.2d 926. In this case, the purchasers of corporate stock from individual shareholders, who were the principal executives and officers of the corporation which issues the stock, required of the sellers covenants not to compete with the buyer for a period of ten years. In the agreement of sale, the values attributable to the stock and to the covenant not to compete were separately stated. The Tax Court found that the parties, in good faith and realistically, treated the convenant in a separate and severable manner in respect to value, and held that the taxpayer could amortize and deduct pro rata the amount thus stated over the life of the covenant not to compete. The Commissioner did not even contend that these findings of fact were not supported by substantial evidence, and, understandably, the Appeals Court affirmed.
 
 
 11
 The taxpayers contend that the 'elements of good-will' found by the Tax Court in this case do not fit within any judicially expressed definition of the term 'good-will', and they cite Grace Bros., Inc. v. Comm., 9 Cir., 173 F.2d 170, as enumerating five essential elements of good-will, several of which are missing in this case. We do not read the Grace case as holding that all of these elements must be present. With a small loan company, its borrowers are its customers. If its business is to continue, relationships and dealings with those customers are essential. Its stock in trade is the sum total of the choses in action which it holds, representing the obligations of its customers to it. When more than the face amount of those choses in action is paid by a purchaser, who expects to continue the small loan business through dealings with those customers, evidence of good-will value can be looked for. That evidence was found here.
 
 
 12
 In Estate of F. G. Masquelette v. Comm., 5 Cir., 1956, 239 F.2d 322, the Tax Court had held that an amount separately stated as being for a covenant not to compete, in connection with the sale of partnership interests in an accounting firm, should be given effect, and that no elements of good-will were present in the purchase, principally because the contract stated that the purchasers were not to use the name of the selling partnership and the business of accounting was a highly personal one. The taxpayer in that case was contending that good-will was involved, and he secured a reversal of the Tax Court by the Court of Appeals under a set of facts which bears strong resemblance to the facts here.
 
 
 13
 The Tax Court in this case found that the separate considerations paid by the purchasers were partly for intangible assets, in the nature of good-will or goingconcern value, and partly for the covenants not to compete. In the absence of satisfactory evidence of the exact values attributable to each of these elements, the Tax Court undertook to allocate values according to its best judgment under the principles of Cohan v. Comm., 2 Cir., 1930, 39 F.2d 540. In the Royal purchase, it assigned 49.5% Of the specified consideration to the covenant not to compete, and the balance to good-will. In the Bankers case, it allocated 64.2% Of the specified consideration to the covenant not to compete, and the balance to good-will. Taxpayers bitterly complain that there was no justification or basis for this allocation. If this question had arisen upon a petition to review by the Commissioner, it might well have been a troublesome one. The taxpayers here are the beneficiaries of the Tax Court's leniency in this respect and are in no position to complain.
 
 
 14
 The decisions of the Tax Court are affirmed.
 
 
 
 [1]
 31 T.C. 278. Commr.Acq.1959-1 Cum.Bull. 5
 
 
 [2]
 'In computing net income there shall be allowed as deductions:
 '(l) (as amended by Sec. 121(c), Revenue Act of 1942, c. 619, 56 Stat. 798) Depreciation.-- A reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)--
 '(1) of property used in the trade or business, * * *'. (26 U.S.C.1952 ed., Sec. 23.)
 
 
 [3]
 'Depreciation of Intangible Property.-- Intangibles, the use of which in the trade or business or in the production of income is definitely limited in duration, may be the subject of a depreciation allowance. Examples are patents and copyrights, licenses, and franchises. Intangibles, the use of which in the business or trade or in the production of income is not so limited, will not usually be a proper subject of such an allowance. If, however, an intangible asset acquired through capital outlay is known from experience to be of value in the business or in the production of income for only a limited period, the length of which can be estimated from experience with reasonable certainty, such intangible asset may be the subject of a depreciation allowance, provided the facts are fully shown in the return or prior thereto to the satisfaction of the Commissioner. No deduction for depreciation, including obsolescence, is allowable in respect of good will.'
 
 
 [4]
 'That in consideration of the payment by the Purchaser to the Seller of the sum of $181,803.00, * * * the Seller hereby sells, assigns, transfers and conveys to the purchaser, * * *
 'All loan accounts, indebtedness of borrowers, notes, promises to pay and other obligations secured and described in Exhibit 'A' attached hereto and made a part hereof, including all claims, choses in action, bills of sale to secure debt, chattel mortgages, liens, pledges and other instruments and security of every kind and nature in any way pledged, assigned, mortgaged or hypothecated to the Seller as security for or in any manner securing or collateral to the said loans or any of them and including all papers, records, cards and any other documents in connection with said loans, including all notes, promises to pay and other obligations and papers in connection with said accounts; all records cards and lists of former borrowers and all papers and documents of every kind pertaining to said former borrowers, and any and all other papers, documents of any kind pertaining to the present and former borrowers of this office.
 'In consideration of the further payment by the Purchaser to the Seller of the sum of $23,397.00, receipt of which is hereby acknowledged, the Seller hereby specifically agrees that it will not, for a period of three (3) years from the date hereof, engage or be interested, directly or indirectly in the business of making loans in the amount of $300.00 or less and loans under a discount plan in the amounts of $2500.00 or less in the City of Tulsa, Oklahoma or in any other town, village, city or locality within fifteen (15) miles of said city, whether such business be actually conducted within such place or conducted from without such place, and during said period, the Seller hereby specifically agrees that it will not in any manner be interested directly or indirectly, in any loan account or any person any of which indebtedness, borrower's notes, promises to pay, or other obligations are hereby sold, assigned or transferred to the Purchaser.'